IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.   3:11CR128–2–HEH |
| | ) | Civil Action No. 3:13CV277–HEH |
| JOAN MARSH | ) | |
| | ) | |

## MEMORANDUM OPINION
### (Denying § 2255 Motion and Dismissing Action)

Joan Marsh ("Marsh"), a federal inmate proceeding *pro se*, submitted this motion under 28 U.S.C. § 2255 to vacate, set aside, or correct her sentence ("§ 2255 Motion," ECF No. 104). The matter comes before the Court after an evidentiary hearing on Marsh's claim that she was denied the effective assistance of counsel during plea negotiations. The matter is ripe for disposition. For the following reasons, the Court will DENY Marsh's § 2255 Motion and will DISMISS her remaining claim.

## I.   PROCEDURAL HISTORY

In November of 2009, Marsh and her boyfriend and co-defendant, Ayodele Adewale Onasanya ("Onasanya"), each received a target letter from the Government. (Tr. of Evidentiary Hr'g ("Hr'g Tr.") 5:21–6:5, June 5, 2015.)[1] Marsh and Onasanya "went to see an attorney right away," and retained John F. Carman, Esquire ("Carman"), who practiced in Garden City, New York. (Hr'g Tr. 6:5–7.) Carman stated that he had never seen anything like the letter, and after some investigation, informed Marsh "that the

---

[1] The Court relies upon some undisputed evidence from the evidentiary hearing to provide a more fulsome procedural history.

government was phishing, and to not worry about it for right now." (Hr'g Tr. 6:25–7:1.)
On May 17, 2011, a grand jury sitting in the Eastern District of Virginia charged Marsh
with Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349 (Count One);
Bank Fraud, in violation of 18 U.S.C. § 1344 (Counts Two through Seven); Conspiracy
to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h) (Count Eight); and
Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(b)(i) (Counts Nine through
Fourteen). (*See* Indictment 1–18, ECF No. 3.) Marsh was arrested on June 2, 2011 in
the Eastern District of New York. (ECF No. 10, at 1.) Carman represented Marsh at her
initial appearance in the Eastern District of New York. Marsh was released the same day
and directed to appear in this Court.

On June 13, 2011, Marsh was arraigned in this Court, pled not guilty, and the
matter was set for a jury trial that fall. (ECF No. 12, at 1.) Carman represented Marsh at
her arraignment in this Court and throughout the criminal proceedings. (ECF No. 18.)
On September 21, 2011, the jury convicted Marsh of Counts One through Nine and
Twelve through Fourteen.[2] (Verdict 1–3, ECF No. 58.)

On December 19, 2011, the Court sentenced Marsh to ninety-six months on each
count, to run concurrently. (J. 2, ECF No. 77.) Marsh noted an appeal; however, on May
1, 2012, the appeal was dismissed on Marsh's motion. (*See* ECF No. 95.)

On April 30, 2013, Marsh filed the instant § 2255 Motion. Marsh asserted several
claims pertaining to the ineffective assistance of trial and appellate counsel. In particular,

---

[2] At the close of the Government's case, the Court dismissed Counts Ten and Eleven on the
Government's motion. (*See* ECF No. 56, at 2.)

Marsh alleged that Carman, as trial counsel, rendered ineffective assistance with respect

to the plea negotiations.  Although Marsh's claim concerning her counsel's negotiation of

a potential plea agreement has several components, at bottom she believes that Carman

should have more aggressively pressed the Government for a better deal.  The strength of

her claim is predicated on a belief that the Government would have been willing to offer

her a more favorable disposition.

Marsh maintains that Carman's representation during plea negotiations was

deficient in three respects.  First, she contends that Carman inaccurately predicted that

she had a seventy percent chance of acquittal at trial.  (Mem. Law Supp. Mot. 28 U.S.C

§ 2255 ("Mem. Supp. § 2255 Mot."), at 11, ECF No. 113.)  Marsh also maintains that

Carman anticipated that she would be facing a U.S. Sentencing Guideline range of only

51–72 months of imprisonment if she were convicted at trial.  Marsh recalls that Carman

explained to her "that the government had offered her a plea offer of 41 months.

However, based on the erroneous advice given to her by Carman, she opted to proceed to

trial."  (*Id.*)

Lastly, she finds fault with her counsel's alleged failure to "attempt to make a

better deal with the government and see if they would go below the 41 months."  (*Id.*)

She asserts that

> [h]ad Carman correctly informed Marsh that she was facing a Guideline
> range of 92–115 months imprisonment as compared to 41 months
> imprisonment, there is a reasonable probability that Marsh would have
> taken the government's plea offer.  Further, had Carman informed Marsh
> that the evidence against her was overwhelming and that it was more like
> 90 percent that she would be convicted, Marsh would have certainly opted
> to accept the government['s] plea offer.

3

(*Id.* at 12.)

The Government responded and proffered an affidavit from Carman indicating

that he and Marsh engaged in extensive discussions about pleading guilty and sentencing

repercussions. (Gov't's Resp., Attach. 1 ("Carman Aff."), ECF No. 115–1). By

Memorandum Opinion (ECF No. 122) and Order (ECF No. 123) entered on January 9,

2015, the Court dismissed all of Marsh's claims except for the claim that her trial counsel

rendered ineffective assistance with respect to plea negotiations. The Court found that

Carman's sworn statement was insufficient to warrant dismissal of that claim. The Court

ordered the matter set for "an evidentiary hearing limited to whether trial counsel

provided ineffective assistance of counsel in the plea bargaining process in violation of

Marsh's Sixth Amendment rights." *United States v. Marsh*, No. 3:11CR128–2–HEH,

2015 WL 139083, at *7 (E.D. Va. Jan. 9, 2015). The Court appointed counsel for Marsh.

On June 5, 2015, the Court conducted an evidentiary hearing on Marsh's remaining claim

and heard final argument from counsel. (Hr'g Tr. 88:9–107:11.)

## II.    STANDARD OF REVIEW AND BURDEN OF PROOF

A petitioner collaterally attacking her conviction bears the burden of proving that

the sentence imposed violated the Constitution or laws of the United States, that the court

lacked jurisdiction to impose such a sentence, that the sentence exceeded the maximum

authorized by law, or that the sentence otherwise is subject to collateral attack. 28 U.S.C.

§ 2255. The petitioner has the burden of proving the grounds for collateral attack by a

preponderance of the evidence. *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir. 1967)

1967) (citing *Bates v. Meadow*, 358 F.2d 674, 675 (6th Cir. 1966)).   In a § 2255

proceeding, a court may hold an evidentiary hearing to "determine the issues and make

findings of fact and conclusions of law." 28 U.S.C. § 2255(b).   When making findings of

fact, the court should determine the credibility of witnesses and reliability of other

evidence. *See United States v. Roane*, 378 F.3d 382, 393–94, 409 n.15 (4th Cir. 2004).

## III.   FINDINGS OF FACT

Supplementing the procedural events above, the Court makes the following

findings of fact based on testimony and exhibits submitted at the evidentiary hearing.

1.      On June 13, 2011, Marsh appeared with Carman before this Court for an

arraignment and was informed of the charges against her and that she faced up to thirty

years in prison for Counts One through Seven, and twenty years in prison on Counts

Eight through Fourteen.   Marsh pled not guilty, and the matter was set for a jury trial.

(ECF No. 12, at 1.)   The Court released Marsh with conditions and Marsh returned to

Queens, New York.   (Hr'g Tr. 8:17–22.)

### A.      Plea Offer from the Government

2.      On August 9, 2011, the Government sent Carman a draft proffer letter, plea

agreement, and statement of facts with an eye toward securing Marsh's cooperation

against her co-defendant Onasanya, who had not yet pled guilty.   (Gov't's Resp. 6; *id.*

Attach. 2, ECF No. 115–2; *see id.* Attach. 3, at 1–3.)

3.      Under this plea agreement, Marsh would have agreed to plead guilty to

Count One of the indictment charging her with Conspiracy to Commit Bank Fraud.

(Draft Plea Agreement ¶ 1, ECF No. 115–3.)   The plea agreement required Marsh to

agree that she was "plead[ing] guilty because [she] is in fact guilty of the charged offense." (*Id.* ¶ 2.) The plea agreement explained that the maximum penalty for this offense was thirty years of incarceration. (*Id.* ¶ 1) The plea agreement also required the Government to dismiss the remaining thirteen counts and conferred immunity on Marsh for all activity set forth in the plea agreement and accompanying statement of facts. (*Id.* ¶¶ 9–10.) The plea agreement also explained that the Court could award Marsh a two-point reduction for acceptance of responsibility under United States Sentencing Guideline Manual ("USSG") § 3E1.1(a), the Government would move for an additional one-point reduction under § 3E1.1(b) for entering the plea prior to trial, and it offered Marsh an opportunity for a sentence reduction pursuant to § 5K1.1 or Federal Rule of Criminal Procedure 35(b). (*Id.* ¶¶ 4, 11–14.) The plea agreement contained no specific sentencing recommendation by the Government.

### B.      Marsh's Version of Testimony Plea Negotiations

4.      After the arraignment, Carman explained to Marsh that the Government wanted to meet with her. (Hr'g Tr. 9:8–10.) According to Marsh, Carman gave Marsh "a few pages stating that I would receive 41 months if I pled guilty, or 51 to 72 months if" they were not successful at trial. (Hr'g Tr. 9:10–13.) Marsh chose not to meet with the Government. (Hr'g Tr. 9:13–14.)

5.      Marsh represented that Carman told her that "we had a 70% chance of winning" and she relied on that representation in deciding to go to trial. (Hr'g Tr. 11:12–21.) The Court finds Marsh's statement incredible. Marsh testified that when Carman made this representation she had "told him everything" about her involvement in

the offense. (Hr'g Tr. 23:18–23.) Marsh admitted that Carman never guaranteed her that she would be acquitted. (Hr'g Tr. 23:10–12.) Marsh always knew there was a possibility that if she went to trial she could be convicted. (Hr'g Tr. 23:13–16.)

6.      Marsh testified that Carman never went over the sentencing guidelines with her, she never saw the guidelines book or the chart, and they never discussed any enhancements. (Hr'g Tr. 12:1–10.) As discussed in greater detail below, the Court finds Marsh's testimony incredible based on the record.

7.      Marsh insists that she "was honest with Mr. Carman from the beginning" about her criminal history. (Hr'g Tr. 12:14–16.) According to Marsh, Carman discussed criminal history with Marsh and relayed that because Marsh's prior convictions "were over 15 years old, it wouldn't play any factor in the sentencing. [She] would be a Criminal History Category I." (Hr'g Tr. 12:19–21.) Marsh contends that she relied on Carman's representation that she would be a criminal history category I. (Hr'g Tr. 13:11–13.)

8.      On two prior occasions Marsh pled guilty to felonies. (Hr'g Tr. 20:23–25.) Marsh pled guilty in the Southern District of New York to conspiracy to distribute and possess with intent to distribute cocaine. (Hr'g Tr. 21:1–6; PSR ¶ 49.) On March 11, 1992, Marsh was sentenced to twenty-four months of incarceration. (PSR ¶ 49.)

9.      Marsh testified that she did not remember the plea proceedings in her old case and stated: "I was 19. I don't really remember everything. It was 26 years ago. But I know I pled guilty. I don't remember all the schematics, but I did plead guilty." (Hr'g Tr. 21:16–18.) When asked whether her sentence was governed by the Federal

Sentencing Guidelines, Marsh responded that "[t]hey went below the guidelines." (Hr'g Tr. 21:22.) Marsh knew that the judge used the federal sentencing guidelines in arriving at her sentence. (Hr'g Tr. 22:5–9.) When asked by her own counsel whether "when [she] stood up to enter her plea" if she "remember[ed] the judge asking a lot of questions," Marsh stated she did not remember. (Hr'g Tr. 37:13–17.)

10. According to Marsh, after Carman told Marsh that she faced "41 months and 51 months, there was never any other discussion of a plea or plea negotiations because I assumed, okay, 10 months, I might as well go to trial. . . . Had I known at the time that 41 months could possibly go down lower with the acceptance . . . I would have pled guilty." (Hr'g Tr. 17:20–18:6.) As further discussed below, the Court finds Marsh's statement incredible.

11. Marsh testified that Carman never told her that if she went to trial her guidelines range could be higher than fifty-one to seventy-two months based on evidence at trial. (Hr'g Tr. 17:11–17.)

12. In a contrary stance to her earlier testimony, (*see supra* ¶ 4), Marsh stated that Carman never showed Marsh the August 9, 2011 email from the Government with an estimate of the guidelines range, (Hr'g Tr. 14:7–10), or the attached draft plea agreement and statement of facts. (Hr'g Tr. 15:19–16:8.) Marsh testified that Carman never discussed a reduction in offense level for acceptance of responsibility for pleading guilty. (Hr'g Tr. 16:9–12.) The Court finds Carman discussed acceptance of responsibility with Marsh, and thus, discredits this statement.

13.     Marsh told Carman that she believed that she was not guilty.  (Hr'g Tr. 18:7–9.)  According to Marsh, "Carman never told me to take a plea.  He never told me I was guilty.  I thought at the time that I was innocent, but in fact I was guilty of the part of the conspiracy."  (Hr'g Tr. 17:3–6.)

14.     Marsh "believed that [she] wasn't guilty of the conspiracy because [Carman] didn't explain to [her] what the charges were and what constituted a conspiracy."  (Hr'g Tr. 24:4–7.)  Marsh testified that even though she had pled guilty to conspiracy back in 1990, "that was different.  This was fraud."  (Hr'g Tr. 24:8–10.) Marsh explained that her understanding was:

> When I saw the counts, one of the counts said some money being transferred between two different people.  To myself I said, well, how can I be guilty of money being changed hands between two people that I didn't even know.  So I wasn't guilty of that.  I didn't realize that in the conspiracy you're responsible for everything in furtherance of the crime.  I didn't know that.  It wasn't explained to me.

(Hr'g Tr. 24:15–22.)  The Court finds Marsh's statement that Carman failed to explain conspiracy incredible and belied by the record.

15.     Marsh testified that she believed that she was innocent "until [she] got into federal prison and started going to the law library . . . . That's when [she] realized that had I known what I know now, I would have never went to trial."  (Hr'g Tr. 25:9–12.) Marsh's statement is incredible.

16.     As of October 15, 2013, when she filed her § 2255 Motion, Marsh was still maintaining her innocence.  (Hr'g Tr. 27:15–20.)

17.     Nevertheless, Marsh testified that she "had no part of that banking fraud. . . . [and] had no knowledge of how he did it." (Hr'g Tr. 28:17–19.) She continued, however, in a contrary stance: "I knew what he was doing, but I had no knowledge of how he did it." (Hr'g Tr. 28:20–21.) She then admitted that "[she] knew about the fraud, but [she] wasn't aware of the schematics." (Hr'g Tr. 29:17–18.)

18.     Marsh admitted that the affidavit she obtained from Onasanya that she attached to her § 2255 Motion was used to demonstrate "that [she] wasn't privy to the schematics of the fraud, but [she] was aware of the fraud" and was not part of the "day to day operations." (Hr'g Tr. 31:21–32:2.)

19.     Marsh testified that Onasanya was her boyfriend and lived with her for three years. (Hr'g Tr. 32:4–9.) When asked whether she knew that one of the main ways to get a sentence reduction after a guilty plea would have been to testify against him at his trial, Marsh stated: "I know that when you're testifying . . . you can possibly get a [USSG §] 5K1 reduction. I did know that." (Hr'g Tr. 32:10–15.) Marsh "never entertained it because we were going to trial." (Hr'g Tr. 32:17–18.)

20.     Marsh claims she has "derivative citizenship of America, but [she is] a subject of the United Kingdom." (Hr'g Tr. 22:15–17.) Marsh was aware of a removal order after her 1990 conviction, but "it was canceled at that time." (Hr'g Tr. 22:18–21.)

21.     When Marsh retained Carman he told her that he knew nothing about immigration and that Marsh should retain an immigration attorney. (Hr'g Tr. 18:16–18.) Marsh met with an immigration attorney who told her that noncitizens are subject to removal if convicted of a federal crime, but Marsh "didn't have anything to worry about."

10

(Hr'g Tr. 18:18–25.)  Marsh was concerned with her immigration status because she

owned a house with her mother and she did not want to leave her mother with a $3,000

mortgage and she was concerned about her mother's well-being.  (Hr'g Tr. 19:1–7.)

22.     Marsh admitted that she was concerned about her mother with whom she

lived "if [she] went to jail or if [she] got removed from the United States."  (Hr'g Tr.

23:5–9.)

23.     Marsh testified that she is a Christian, but that she never told Carman that

her religious faith compelled her to go to trial.  (Hr'g Tr. 19:25–20:3.)  She told Carman

that she "had faith.  You know, you have to have faith to make decisions that can make a

major impact on your life. . . .  Based on what he told me, I had faith in him that we could

build a case."  (Hr'g Tr. 20:5–9.)

24.     Marsh explained that Carman told her that three of her co-defendants were

going to testify against her at trial.  (Hr'g Tr. 33:3–7.)  Marsh agreed that those people

were Sandra Caiby, Chad Vieux, and Shannon Greene.  (Hr'g Tr. 33:8–14.)  Marsh

"heard on the street that [Ms. Caiby] told everyone she went to the grand jury.  She said

she was going to testify, but because we were suppose[d] to be best friends for 25 years, I

couldn't really believe that she was going to do it, but she did."  (Hr'g Tr. 34:15–19.)

25.     Marsh admitted that if in September of 2011, she "had been placed under

oath and asked whether [she] were in fact guilty of the crimes charged in th[e]

indictment," her answer would have been "no . . . [b]ecause at that time [she] thought

[she] was not guilty of the actual charges."  (Hr'g Tr. 36:1–12.)  In an attempt to temper

this statement, counsel asked Marsh what her answer would have been if she had

11

"understood the elements of conspiracy." (Hr'g Tr. 36:19–37:1.) Marsh responded:
"Guilty." (Hr'g Tr. 37:2.) As further discussed below, the Court finds Marsh's
statement, that she lacked an adequate understanding at the time of her trial, incredible.

26.    The Court asked Marsh whether she remembered him "read[ing] all the
instructions to the jury that described each and every offense and what needed to be
proven?" (Hr'g Tr. 37:23–38:1.) Marsh responded "[y]es." (Hr'g Tr. 38:2.) The Court
also asked Marsh: "And yet when you sent into the Court your petition under . . .
[§] 2255, you still maintained that you were not guilty, is that right?" (Hr'g Tr. 38:3–5.)
Marsh answered: "Yes, Your Honor." (Hr'g Tr. 38:6.)

27.    The Court finds Marsh's testimony that, only after her conviction when she
learned what the elements of conspiracy were, that she then believed she was guilty, is
simply incredible. Marsh continues to dissemble with respect to her personal
responsibility for the criminal conduct at issue.

C.    **Carman's Version of the Plea Negotiations**

28.    Carman explained that he has been practicing law in Long Island, New
York since 1990 and more than ninety percent of his practice is criminal defense. (Hr'g
Tr. 39:17–40:16.) Carman estimated that he had handled over 400 federal criminal cases
in his career. (Hr'g Tr. 41:5–9.)

29.    Carman agreed that he would represent Marsh in 2009 because of her status
as a target. (Hr'g Tr. 42:8–14.)

30.    After Marsh was indicted, Carman appeared with Marsh at her initial
appearance in the Long Island courthouse for the Eastern District of New York, and then

at her arraignment and detention hearing in this Court in June 2011. (Hr'g Tr.
42:24–43:19.)

31.     Carman knew that Marsh "didn't have the resources, from my
understanding, that would have been necessary to support a preparation and defense of
this indictment through trial." (Hr'g Tr. 44:11–13.)

32.     Carman explained:

> I think I recognized fairly early that there was a good possibility that there
> would be a trial. And the reason for that conclusion was that Ms. Marsh, in
> our meetings and conversations, and she doesn't - - she didn't at the time
> live very far from where my office was, but never embraced the idea of
> accepting responsibility.   She never acknowledged to me that she was
> knowingly a part of this. And so I also viewed the possibility of a plea as
> being problematic of her being able to get through a statement before the
> Court that she was actually responsible for the conduct in question.

(Hr'g Tr. 46:9–19.)

33.     On July 7, 2011, Marsh had been released on bond and was living in
Jamaica, Queens. (Hr'g Tr. 47:11–19.) An email from the same date from Assistant
United States Attorney Michael Moore, who prosecuted Marsh's case, indicated that
Carman had asked for a summary of the Government's evidence implicating Marsh in the
fraud scheme. (Gov't's Ex. 1, at 1–2.)

34.     Carman explained: "I met with Joan on multiple occasions to discuss
possible plea terms. I also met with her to discuss how we would defend the case, and to
educate myself about who these people were and what they might say about her if she
came to court . . . ." (Hr'g Tr. 49:4–8.) Carman indicated that "Joan always struck [him]

13

as a very intelligent person.  She asked smart questions about what would happen

whether we took a plea or whether we went to trial."  (Hr'g Tr. 49:15–17.)

35.     After receiving the summary of the evidence against her, Carman explained

that Marsh's "tact might . . . be described as, you know, she had ideas about why it was

that the case might be very difficult to prove against her.  And frankly, at the same time

maintaining that . . . while it happened, and she may have caught wind of parts of it, that

she wasn't a knowing participant."  (Hr'g Tr. 49:25–50:5.)

36.     Carman explained that

> Joan also expressed a lot of faith that some of the witnesses that you
> referred to, and that who we thought might be on the witness list, might not
> actually come to court.  That they were friends of hers for a long time, and
> they might feel as though, you know, in the end that they would sidestep
> any effort on the part of the government to bring them here.  So she was
> confident someone wouldn't come in and say, yes, Joan knew about this.

(Hr'g Tr. 50:6–14.)  Carman believed that Marsh's position was "that she was not guilty

of participating in th[e] conspiracy" and "that the government could not prove the

case[.]"  (Hr'g Tr. 50:16–20.)

37.     Marsh and Carman often discussed Marsh's mother, who was in her late

seventies or early eighties and was dependent on Marsh.  (Hr'g Tr. 52:4–9.)  Marsh was

not a citizen of the United States, but of the United Kingdom, which "made it, not just

highly likely but almost inevitable, that if she were convicted either by plea or after trial,

that she would be deported back to the United Kingdom.  And that weighed heavily upon

her because she was concerned for her mother's welfare."  (Hr'g Tr. 52:10–16.)  Carman

believed that Marsh's concerns about deportation when put "all in together" with "the

fact that . . . she didn't acknowledge the knowing participation in Mr. Onasanya's conspiracy . . . was probably just a part" of Marsh's concerns. (Hr'g Tr. 52:20–24.)

38.     On July 12, 2011, Carman received an email from Moore wherein Moore provided Carman with an estimated advisory guidelines calculation. (Hr'g Tr. 53:12–18; *see* Gov't's Ex. 2, at 1.)[3] Carman explained that the "email was generated as a result of" his conversation with Moore about "sentencing exposure for Ms. Marsh to take the plea" and "possible plea terms." (Hr'g Tr. 53:23–54:3.)

39.     Carman would have asked the Government about a plea offer "in the ordinary course. . . . I would have called Mike to say, look, Mike, what would a plea look like in this case so I can take it to her and make sure that, you know, she knew that that was an option that she might consider." (Hr'g Tr. 54::7–14.)

40.     Carman shared this information with Marsh and conducted his own independent analysis of what her sentence might be under the guidelines. (Hr'g Tr. 54:20–55:24.) Onasanya had not yet pled guilty, so Carman "was in regular communication with [Onasanya's counsel] about what we could do to tweak the guidelines so that it was potentially most favorable." (Hr'g Tr. 55:21–24.)

41.     Carman would have also had conversations with Marsh at this time explaining that "guideline figures in a pretrial environment can sometimes be different

---

[3] The email provided Moore's "'worst case scenario' advisory guideline calculations with the standard *caveat* that the calculations of the probation office or Court might differ and that any deviation between these calculations and those in the PSR would not be a valid basis for withdrawal of a guilty plea." (Gov't's Ex. 2, at 1.) Moore explained that he did not "have her criminal history category in front of me, but I know much of it is pretty old." (*Id.*) The calculation ranged between 41 months to 63 months depending on whether Marsh was found to be a criminal history category I, II, or III. (*Id.*)

than they are in the posttrial environment. That is because we don't always know what evidence will be brought before the Court, and it can change the calculations . . . ." (Hr'g Tr. 56:3–7.)

42.    When asked if he ever told "her that if she entered a guilty plea that she would be guaranteed a sentence of 41 months," Carman insisted:

> That's something I would never say. And I wouldn't say that because . . . I've been representing criminal defendants in probably 200 sentences in my career. . . . And so I learned that probably when I was about 29 to never tell your client that there was any guarantee.
> And of course the Federal Sentencing Guidelines leave all the discretion to the Court in terms of what the sentence is, so I never have represented to her that she was guaranteed 41, or frankly, anything even within the guidelines range.

(Hr'g Tr. 56:12–57:2.) The Court finds Carman's testimony credible.

43.    When asked if he promised Marsh a sentencing range no greater than 51 to 72 months if she went to trial Carman explained:

> I don't think there's any question that Joan and I talked about how the trial might negatively impact her guidelines calculations. . . .
> But I think the overarching advice and counsel I gave to her was that by going to trial, you basically eliminate your ability to nail down any of those things to any extent. . . . [W]e can't lock down Judge Hudson. . . . [W]e can count on the government, at least at sentencing, not to argue for a higher number if we agree to this prior to the plea.

(Hr'g Tr. 57:3–21.) Carman admitted that he had no "specific recollection of giving that alternative advisory guideline range as a possible sentencing exposure," but he would have discussed "many different guidelines ranges that could result," and would have explained to Marsh that when you go "to trial[,] . . . you lose whatever limited ability we

16

have to control guideline numbers" because evidence presented at trial could "affect your role in the offense and generate enhancements." (Hr'g Tr. 82:18–83:5.)

44.    Carman explained that "from an offense characteristic standpoint, it wasn't an incredibly complicated calculation. And acceptance of responsibility . . . that would have been part and parcel of any conversation I had with her about the guidelines." (Hr'g Tr. 57:25–58:6.) Carman explained that he believed if Marsh pled guilty "the 41 month advisory guideline plea agreement that [he] thought they might offer her, gave [them] a good sense of where her sentencing exposure would fall." (Hr'g Tr. 79:20–24.)

45.    Carman had no specific recollection of showing Marsh the United States Sentencing Guidelines Manual but his "custom and practice would have been to show her the actual book . . . [and] the chart on the back page." (Hr'g Tr. 80:2–12.) He also stated that "if you were to tell me that I didn't show her the book, it would surprise me." (Hr'g Tr. 80:8–9.) The Court finds that Carman followed his common custom and practice here.

46.    In early August of 2011,

> there was a level of urgency to the situation whether we would be going to trial or attempting to make some type of agreement that would result in a plea.
> And my thinking at the time was that given the nature of Ms. Marsh's relationship with Mr. Onasanya, who still had not pled guilty . . . there was some indication that Mr. Onasanya - - and I thought at the time that it was much more likely that he would go to trial, that the government might permit Ms. Marsh to come in and . . . at least tell the truth about what happened from her perspective in the context of these transactions.
> And so I was actively encouraging her to consider entering a plea, but to do it in the context of a possible cooperation agreement.

(Hr'g Tr. 58:19–59:8.)

17

47.   Carman believed that if Marsh "ingratiated herself with the government, there [was] a mechanism that permits the government to advocate for her not to be removed from the country." (Hr'g Tr. 59:15–18.) Carman "viewed [a cooperation agreement] as a potential lifesaver for what she was trying to accomplish, but I recognized that . . . it would require a proffer that was consistent with what the government believed the evidence to be, not, frankly, what Joan Marsh had told me the evidence was up until that point." (Hr'g Tr. 59:19–24.) Carman hoped that "if at some point Joan was interested enough in going down that road, we might be able to bridge the factual gap and get her to proffer in a way that the government could accept her version as truthful, given what they knew." (Hr'g Tr. 60:2–6.)

48.   Carman scheduled a meeting between himself, Marsh, and the Government for August 9, 2011, wherein Marsh was "to be interviewed under the protection of a proffer letter." (Hr'g Tr. 61:2–13.) Carman explained that the proffer letter and statement of facts "would have been discussed in great detail." (Hr'g Tr. 61.) He explained to Marsh that

> the proffer could lead to a cooperation agreement that could lead potentially to a motion by the government at sentencing, . . . [b]ut more important than any of that was the idea that any proffer . . . would have assumed that she would accept responsibility for knowing participation in the bank fraud conspiracy. And to the best of my recollection, that was the stumbling block.

(Hr'g Tr. 62:5–14.)

49.   When Marsh refused to "provide a version of facts that was consistent with the government's theory of her involvement," Carman explained that this "ma[de] the

18

proffer session an incredibly bad idea" and would be dangerous if she were to go to trial. (Hr'g Tr. 62:15–63:6.) Carman used the documents and the statement of facts as a "blueprint" to say to Marsh "this is really what you need to agree to in sum and substance." (Hr'g Tr. 62:25–63:2.)

50.    Carman went through the plea agreement and the statement of facts with Marsh. (Hr'g Tr. 63:20–64:4.)

51.    Carman explained to Marsh that she faced a statutory maximum under the plea of thirty years. (Hr'g Tr. 64:16–20.)

52.    Carman also testified that "an explanation about the advisory nature of the guidelines is fundamental to my job in explaining a plea agreement to a client. So that's something that Joan would have gotten from me." (Hr'g Tr. 65:1–5.) Carman also explained that the any guidelines range was a "prediction . . . [and] would not be binding on the Court." (Hr'g Tr. 65:6–11.) The Court finds Carman's testimony credible.

53.    When asked whether Carman and Marsh discussed potential criminal histories under the guidelines, Carman explained:

> What I would say for that is our conversation about a plea under the proposed guidelines, I'm not so sure that it evolved to the point where she gave any meaningful indication that she was interested in that. . . .  [I]n early July of 2011, when the advisory numbers were proposed by Mr. Moore, my recollection is that at that time, because we weren't even really kind of close to the idea of taking a plea, I don't know that there was a very detailed discussion about a criminal history category. . . .

(Hr'g Tr. 81:3–12.)

54.    Carman explained that the primary motivation for canceling the August 9, 2011 meeting with the Government was "Joan's inability or unwillingness to indicate that

she could accept responsibility factually for a level of involvement and understanding and knowledge in the bank fraud conspiracy." (Hr'g Tr. 65:21–24.) Carman believed Marsh "was in full agreement that we couldn't have the meeting if she was required to acknowledge substantially what was set forth in [the Statement of Facts]." (Hr'g Tr. 66:7–10.)

55.     Carman sensed "that Joan Marsh was a very religious person. She often spoke to me about the fact that she believed that her faith would get her through this. That she had confidence in that. And that that was a big part of the decision-making that she was engaged in." (Hr'g Tr. 66:14–18.) Carman "discouraged her from placing too much faith in her religion," but "[s]he believed - - she had faith that if she went to trial she would be okay." (Hr'g Tr. 66:25–67:6.) Carman characterized her faith as "ongoing" but he "recall[ed] it being focused around the time she's making this big decision" whether or not to plead guilty. (Hr'g Tr. 86:4–87:1.)

56.     Carman testified that his litigation file for Marsh's case "runs into the thousands of pages." (Hr'g Tr. 73:22–23.)

57.     Carman thoroughly explained to Marsh the elements of conspiracy. When asked whether Carman explained to Marsh "what a conspiracy was and . . . the elements of conspiracy," Carman stated that "[w]e had many detailed discussions about the government's case, the indictment, what type of evidence would be brought to bear. And, yes, what the government would need to prove in order to make her guilty. And so, yes, the answer to that is absolutely." (Hr'g Tr. 76:3–14.) Carman admitted that he did not recall *how* he explained the distinction between a substantive charge of bank fraud

and a conspiracy to commit bank fraud but that he did draw the distinction between the two when explaining the charges to Marsh. (Hr'g Tr. 76:15–20.) The Court finds Carman's testimony that he discussed conspiracy with Marsh credible.

58.     Carman admitted that he lacked a "specific recollection of sitting in [his] office with [Marsh]" explaining the terms of the proffer, however, his testimony reflected his "custom and practice" and he stated that, "frankly, it's hard for me to imagine that that wouldn't have occurred." (Hr'g Tr. 78:3–9.) Carman, nevertheless, remembered a long meeting with Marsh after receiving the plea documents from the Government in which he "was trying . . . to educate Joan about what it meant." (Hr'g Tr. 78:19–20.)

59.     Under the plea agreement, Marsh would have had the money laundering counts dismissed. (Hr'g Tr. 87:15–17.) Marsh was convicted of money laundering at trial which also had a negative impact on her guideline range. (Hr'g Tr. 87:18–23.)

### D.     Carman's Credibility Versus Marsh's Credibility

60.     Carman was candid about his lack of specific recollection of the details of his discussions with Marsh about pleading guilty to Count One and Marsh's sentencing exposure. Nevertheless, Carman provided a fulsome account of his discussions with Marsh. Carman knew he would have had these discussions with Marsh and also recalled having a lengthy meeting with her after he received the plea documents from the Government. Carman is a seasoned criminal defense attorney and explained that his pattern and practice would be to go over these plea documents, the elements necessary to prove conspiracy, and her sentencing exposure. Carman adamantly insisted that he never would have told Marsh that she would receive a certain sentence. Carman also provided

an extensive and detailed account of how Marsh refused at any time to admit to her involvement in the conspiracy as described in the Statement of Facts.  Because of Marsh's refusal to accept responsibility, a fundamental element of pleading guilty, plea negotiations became futile.

Marsh, on the other hand, provided terse answers with little explanation.  Marsh is a sophisticated, intelligent defendant with a prior federal conspiracy conviction.  Marsh provided sparse testimony about the plea negotiations and testified only to exactly what would appear to most favor her success on her claim.  For example, Marsh stated that Carman never explained the elements of conspiracy so she thought she was innocent until she conducted her own research after her conviction.  Marsh also claims that Carman promised her a certain sentencing range if she continued to trial.  Marsh contends that she would have pled guilty if she knew her true sentencing exposure and if she understood that she was actually guilty of conspiracy.  Marsh, nevertheless, provided inconsistent testimony about whether she truly believes she is guilty even as of the date of filing her § 2255 Motion.  Given the sum of the testimony, such claims by Marsh lack the ring of truth.  The record here makes abundantly clear that Marsh's continued protestations of her innocence dominated her discussions with Carman.  Ultimately, while Carman's recollections are not specific, the Court credits Carman's version of the substance of the conversations with Marsh over Marsh's version of the same events.

### E.    Marsh's Sentencing Exposure

61.    If Marsh had entered into a guilty plea to Count One, the Government predicted that she would receive an advisory guideline sentence between forty-one

22

months and sixty-three months depending on whether Marsh was found to be a criminal history category I, II, or III. (Gov't's Ex. 2, at 1.)[4] Neither the Government nor Carman anticipated that Marsh would be a criminal history category IV which bumped her guideline range up to a range of sixty-three months to seventy-eight months. Because Marsh was a criminal history category IV, Marsh would have received up to seventy-eight months even if she had pled guilty.

62.     After Marsh's trial, the PSR found her offense level to be a twenty-six because Marsh no longer qualified for a three-point reduction for acceptance of responsibility and received two additional points for her conviction on other counts. (PSR Worksheet A, at 2.) With a criminal history IV, Marsh's advisory guideline range was 92 to 115 months. (PSR Worksheet D, at 1.)

## IV.   ANALYSIS

### A.   Standard of Review

The standard of review for petitions alleging ineffective assistance of counsel is well-established in 28 U.S.C. § 2255 jurisprudence. To demonstrate ineffective assistance of counsel, a convicted defendant must show first that counsel's representation was deficient and second that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient

---

[4] This was based on a base offense level of seven, fourteen points for the amount of loss, a four-point enhancement for her leadership role in the offense, a two-point reduction for acceptance of responsibility, and one-point reduction for an early plea, for a total offense level of twenty-two. (Gov't's Ex. 2, at 1.) The PSR ultimately found her base offense level to be seven, added fourteen points for the amount of loss, and added a three-point enhancement for her leadership role. (PSR Worksheet A, at 1.)

performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

The two-part *Strickland* standard applies to claims arising out of the plea-bargaining process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *see Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). As a general rule, counsel has a duty to communicate formal plea offers from the Government to the defendant. *See Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012). A defense attorney's inaccurate advice or misinformation in conveying a plea offer may constitute deficient performance. *See United States v. Brannon*, 48 F. App'x 51, 53 (4th Cir. 2002) (unpublished) (citation omitted); *see also United States v. Merritt*, 102 F. App'x 303, 307–08 (4th Cir. 2004) (unpublished); *Wolford v. United States*, 722 F. Supp. 2d 664, 687–88 (E.D. Va. 2010). Moreover, incomplete advice in conveying a plea may also provide a basis for a claim of ineffective assistance of counsel. *Wolford*, 722 F. Supp. 2d at 689; *see United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992). In the plea context, to demonstrate prejudice, Marsh must also show that

24

"counsel's constitutionally ineffective performance affected the outcome of the plea process." *Merzbacher v. Shearin*, 706 F.3d 356, 363 (4th Cir. 2013) (quoting *Hill*, 474 U.S. at 59). Here, Marsh contends that she is entitled to relief because Carman provided inaccurate advice in conveying the plea offer. As discussed in greater detail below, the Court concludes that Marsh has demonstrated neither deficiency of counsel nor any resulting prejudice.

### B.   Carman's Conduct in Conveying the Plea Offer

The United States Court of Appeals for the Sixth Circuit has observed that in general, "[a] criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising" the option to plead guilty or proceed to trial. *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003). Thus, when communicating a plea offer, counsel "should usually inform the defendant of the strengths and weaknesses of the case against [her], as well as the alternative sentences to which [s]he will most likely be exposed." *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (citations omitted).

"On the other hand, the ultimate decision whether to plead guilty must be made by the defendant." *Id.* (citation omitted). "[A] lawyer must take care not to coerce a client into either accepting or rejecting a plea offer." *Id.* (citing *Jones v. Murray*, 947 F.2d 1106, 1111 (4th Cir. 1991)). In successfully steering a course between inadequate advice and coercing a plea, counsel enjoys a "wide range of reasonableness" and "[t]here are

countless ways to provide effective assistance in any given case." *Id.* (internal quotation marks omitted) (citation omitted).  Accordingly,

> [c]ounsel rendering advice in this critical area may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea . . ., whether the defendant has maintained [her] innocence and the defendant's comprehension of the various factors that will inform [her] plea decision.

*Id.*

Here, Marsh contends Carman was deficient in three regards:  (1) because he promised her a seventy percent chance of acquittal if she rejected the plea offer and proceeded to trial; (2) that her sentencing exposure would be fifty-one months to seventy-two months if she went to trial, as opposed to forty-one months if she pled guilty; and (3) he failed to "attempt to make a better deal with the government and see if they would go below the 41 months."  (Mem. Supp. § 2255 Mot. 11.)

### 1.    Prediction About Acquittal

First, Marsh contends that Carman told her that "we had a 70% chance of winning" and she relied on that representation in deciding to go to trial.  (*See supra* ¶ 5.)[5] Nevertheless, Marsh admitted that Carman never guaranteed her that she would be acquitted.  (*Id.*)  Marsh also admitted that she always knew there was a possibility that if she went to trial she could be convicted.  (*Id.*)  Carman averred that he never estimated Marsh's chance of acquittal at seventy percent.  (Carman Aff. ¶ 9.)  Carman avers that he lacks any recollection of making a percentage prediction for the outcome of trial, but if he

---

[5] The Court cites to the specific findings of fact in Part III of this Memorandum Opinion.  The Court omits any internal quotation marks for quotations from Part III.

had made such a prediction, would have assessed the odds of acquittal of no better than twenty percent. (*Id.*) The Court credits Carman's testimony that he never made an estimate that Marsh's odds of acquittal were seventy percent. The Court finds Marsh's testimony incredible.

Nevertheless, even if Carman had made a guess as to Marsh's odds of acquittal if she pursued a trial, this advice did not significantly affect Marsh's decision to plead not guilty and go to trial. As explained in greater detail below in Part IV.C., Marsh fails to demonstrate that she would have entered into the plea agreement. Instead, Marsh's refusal to accept responsibility for her actions as provided in the statement of facts and proffer and her continued and persistent insistence of innocence belie her claims that she would have pled guilty.

### 2. Sentencing Exposure

Marsh also argues that Carman told her that her sentencing exposure would be fifty-one months to seventy-two months if she rejected the plea offer and went to trial, when she would have received forty-one months if she accepted the plea offer. "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Day*, 969 F.2d at 43 (citations omitted). While "familiarity with the structure and basic content of the Guidelines . . . [is] a necessity" for counsel representing federal defendants, counsel need not provide "each defendant anything approaching a detailed exegesis of the myriad arguably relevant nuances" therein. *Id.*

27

First, Marsh was certainly aware that she could receive more than fifty-one to seventy-two months for the charges against her. The Court explained to Marsh during her arraignment that she could receive up to thirty years of incarceration. The draft plea agreement also provided that Marsh faced a statutory maximum of thirty years for Count One. Nowhere in her testimony does Marsh state that she failed to understand that she could receive up to thirty years if convicted. Marsh claims that Carman never showed her the August 9, 2011 email from the Government.[6] The Court credits Carman's testimony that he conveyed the Government's plea offer to Marsh including the Government's prediction of a low-end sentence of forty-one months if she was a criminal history category I and discussed other advisory guidelines ranges with her. (*See supra* ¶¶ 40–44.)

Contrary to Marsh's testimony, nowhere in the Government's draft plea agreement was a guarantee that she would receive forty-one months if she pled guilty. Instead, the draft plea agreement contained no specific sentencing recommendation. The Court credits Carman's testimony that he would have never promised Marsh that she would receive forty-one months if she pled guilty or "anything even within the guideline range." (*Id.* ¶ 42.) At most, Carman was optimistic that, if Marsh accepted responsibility, pled guilty, and assisted the Government, she could receive forty-one months. Carman's prediction was based on the Government's calculations of the advisory guidelines, the

---

[6] In a somewhat contrary stance, Marsh indicated early in her testimony that Carman gave her a "few pages stating that she would receive 41 months if I pled guilty, or 51 to 72 months" if they were not successful at trial. (*See supra* ¶ 4.) Marsh's testimony that Carman provided her a "few pages" indicates that Carman likely provided her with either a portion of the plea documents from the Government or with his own estimated sentencing calculation.

likelihood that the Government would not push for any further enhancements in exchange for her guilty plea, and an assumption that she was a criminal history category I. (*See id.* ¶ 44.)

Marsh's claim that Carman told her she could receive from forty-one months to seventy-two months of incarceration if she went to trial also lacks the ring of truth. First, no sentencing guideline range exists that ends with a seventy-two-month period of incarceration. (USSG Sentencing Table (2011).) Carman, an experienced federal criminal defense attorney who was intimately familiar with the sentencing guidelines, would not promise such an arbitrary number as a maximum sentence. Second, despite Carman's lack of specific recollection about the details of his discussion with Marsh about sentencing possibilities, Carman clearly shared different potential guidelines ranges with Marsh that could result from pleading guilty or pursuing a trial. (*See supra* ¶ 43.) Carman also explained to Marsh that if she went to trial she would "lose whatever limited ability [she] had to control guideline numbers." (*Id.*) Carman credibly testified that "the Federal Sentencing Guidelines leave all the discretion to the Court in terms of what the sentence is, so I would never have represented to her that she was guaranteed . . . anything even within the guidelines range." (*Id.* ¶ 42.) Carman explained that while he fails to recollect specifically whether he showed Marsh the United States Sentencing Guidelines Manual, his "custom and practice" would have been to show Marsh the book. (*Id.* ¶ 45.) The Court finds Marsh's testimony, that Carman promised her a sentence between forty-one months and seventy-two months if she continued to trial, palpably incredible. Carman clearly discussed a variety of potential sentencing ranges with Marsh

and Marsh was aware that her sentencing exposure would be greater if she opted to go to trial.

It is less clear whether Marsh anticipated that she could receive a ninety-two-month sentence based on the fact that she was a criminal history category IV. Counsel admits that he recalls having little discussion about her criminal history because "we weren't even close to the idea of taking a plea." (*Id.* ¶ 53.)

### 3. Failure to Pursue More Favorable Plea

Finally, Marsh argues that Carman failed to "attempt to make a better deal with the government and see if they would go below the 41 months." (Mem. Supp. § 2255 Mot. 11.) First, Carman stridently rejects the contention that he failed to aggressively pursue a more favorable plea agreement. He asserts that he engaged in continuing negotiations with the prosecutor "almost to the point of trial." (Carman Aff. ¶ 6.) Marsh offers no evidence outside of her vague statement in her § 2255 to support this contention. For this reason alone, the Court finds Marsh fails to demonstrate any deficiency of counsel on this claim. Moreover, any attempt to pursue a more favorable sentence in exchange for Marsh's guilty plea would have been futile as the requisite element of a guilty plea—an admission of guilt—was entirely absent.

A Court reviewing an ineffective assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case." *Strickland*, 466 U.S. at 690. Here, the draft plea agreement required Marsh to agree that she was "plead[ing] guilty because the defendant is in fact guilty of the charged offense." (Draft Plea Agreement ¶ 2, ECF No. 115–3.) The draft plea agreement also required Marsh to

30

"admit[ to] the facts set forth in the statement of facts filed with this plea agreement and agree[] that those facts establish guilt of the offense charged beyond a reasonable doubt." (*Id.*) It is undisputed that Marsh refused to agree that she was guilty beyond a reasonable doubt to facts as provided in the statement of facts. In the instant case, Carman acted reasonably. When faced with Marsh's refusal to accept responsibility for her actions, Carman prudently discerned that entering into a plea agreement would be ill-advised if not impossible.[7]

Carman explained that he "recognized fairly early" in his representation of Marsh, "that there was a good possibility that there would be a trial" because Marsh "never embraced the idea of accepting responsibility." (*Supra* ¶ 32.) Carman explained that Marsh "never acknowledged to [Carman] that she was a knowingly a part of this." (*Id.*) Thus, when Marsh would not admit her guilt in the conspiracy, Carman "viewed the possibility of a plea as being problematic" (*id.*) and eventually was the "stumbling block." (*Id.* ¶ 48.) Carman reasonably believed that continued plea negotiations and the proffer meeting could harm Marsh if she failed to admit fully to the factual basis for the plea because in the end, if the negotiations fell apart, any information she provided could hurt her. (*Id.* ¶ 49.)

Despite Marsh's indication that she was innocent, Carman actively pursued a plea agreement with the Government. Carman sought the evidence against Marsh from the Government and subsequently discussed this evidence with Marsh and the strength of the

---

[7] For the first time at the evidentiary hearing Marsh claimed that Carman never explained conspiracy law to her so she failed to appreciate that she was guilty. As discussed in Part IV.C., this contention is unavailing.

witnesses who would possibly testify against her at trial. Carman requested a plea offer

from the Government and pursued an opportunity to reduce Marsh's sentencing exposure

by scheduling a proffer meeting for her to testify against Onasanya. Carman clearly

conveyed the plea offer from the Government to Marsh and discussed the terms of the

plea agreement, the statement of facts, and the merits of the offer. Carman discussed a

variety of potential sentencing ranges with Marsh including acceptance of responsibility,

and that if she went to trial, her sentencing exposure would be greater. Carman viewed

the cooperation agreement as "a potential lifesaver" for Marsh to not be removed from

the United States and hoped they "might be able to bridge the factual gap and get her to

proffer in a way the Government would accept . . . as truthful." (*Id.* ¶ 47.) Carman

"actively encourage[ed]" Marsh to enter a plea and to do so in the context of a possible

cooperation agreement. (*Id.* ¶ 46.)

Nevertheless, Marsh would not accept her involvement in the conspiracy as

outlined in the statement of facts. While Marsh claims that Carman never told her she

was guilty, it was not Carman's role to make the decision for her to plead guilty. To the

contrary, Carman had an affirmative duty not to exert undue influence on Marsh about

accepting the plea. *Jones*, 947 F.2d at 1111. "[A]t this point and in the context of his

client's rejection of the plea offer for the stated reason that [she] was innocent," Carman

reasonably "refrain[ed] from a vigorous attempt to change his client's mind." *Id.*

(citation omitted). Marsh fails to demonstrate that Carman acted unreasonably under the circumstances.[8]

Nevertheless, even if the Court somehow found Carman's conveyance of the plea was constitutionally deficient, Marsh fails to demonstrate she was prejudiced by Carman's actions.

### C.     Marsh Fails to Demonstrate Prejudice

Under the present circumstances, "the prejudice inquiry focuses on 'whether counsel's constitutionally ineffective performance affected the outcome of the plea process.'" *Merritt*, 102 F. App'x at 307 (quoting *Hill*, 474 U.S. at 59). Marsh must demonstrate "a reasonable probability" that she would have accepted the plea offer if she "had . . . been afforded effective assistance of counsel." *Frye*, 132 S. Ct. at 1409; *see Merritt*, 102 F. App'x at 307.[9] Marsh fails to demonstrate that but for deficient advice from counsel, she would have accepted any plea offer, much less the plea offer that was on the table .

Marsh's continued and persistent professions of innocence belie her current assertions that she would have pled guilty to Count One in a timely manner but for some

---

[8] Additionally, Marsh alone, not counsel, could have secured a potentially lower sentence if she agreed to provide the Government with substantial assistance and provide information in the proffer meeting about her co-defendant Onasanya. Marsh never indicated that she would be willing to assist the Government in any meaningful way. Instead, the evidence demonstrates that Marsh would not agree to accept responsibility for her role in the conspiracy in accordance with the proffer or statement of facts. Marsh demonstrates no deficiency of counsel with respect to her claim that he failed to pursue a more favorable plea.

[9] Marsh must also show that "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 132 S. Ct. at 1385. It is undisputed that Marsh would have received a lesser sentence if she had entered a guilty plea, although not the forty-one-month sentence she desired. (*See infra* IV.C.)

constitutional deficiency of Carman. *See United States v. Muhammad*, No. 3:08CR146, 2014 WL 295755, at *4 (E.D. Va. Jan. 27, 2014) (citations omitted). Carman's undisputed testimony reflects that at the time the Government's plea offer remained open, Marsh never expressed a willingness to accept her guilt of Count One. Carman testified that Marsh "never embraced the idea of accepting responsibility. She never acknowledged to me that she was knowingly a part of [the conspiracy]." (*Supra* ¶ 32.) After explaining the evidence against her provided by the Government, Marsh "maintain[ed] that . . . while it happened, . . . she wasn't a knowing participant." (*Id.* ¶ 35.)

For the first time during the evidentiary hearing, Marsh testified that Carman failed to explain the elements that the Government would have needed to prove to convict her of conspiracy. Specifically, she contends that she "didn't realize that in the conspiracy you're responsible for everything in furtherance of the crime. I didn't know that. It wasn't explained to me." (*Id.* ¶ 14.) Marsh contends that if she had understood the elements of conspiracy, she would have accepted her guilt and pled guilty. Marsh claims she only learned she was guilty of conspiracy when she used the law library in the federal prison. (*Id.* ¶ 15.) The Court finds Marsh's self-serving testimony at this late juncture incredible, belied by the record, and, more importantly, belied by her own testimony.

Marsh is a seasoned, sophisticated defendant who was previously convicted of a federal conspiracy count. The Court finds Marsh had more than a passing familiarity with what the Government would be required to prove to find her guilty of conspiracy in

34

light of her prior conspiracy conviction. Marsh's prior conviction also exposed her to federal plea proceedings and the federal sentencing regime. Carman testified that he and Marsh met on multiple occasions to discuss plea terms and "how we would defend the case, and to educate myself about who these people were and what they might say about her if she came to court." (*Id.* ¶ 34.) Carman described Marsh as "very intelligent" and explained that "[s]he asked smart questions about what would happen whether we took a plea or whether we went to trial." (*Id.*) Carman "absolutely" knew that he explained "what a conspiracy was and . . . the elements of conspiracy." (*Id.* ¶ 57.) Carman and Marsh "had many detailed discussions about the Government's case, the indictment, what type of evidence would be brought to bear. And yes, what the government would need to prove in order to make her guilty." (*Id.*) Carman also explained to Marsh the difference between substantive counts of bank fraud and a conspiracy to commit bank fraud. (*Id.*)

Nothing in the record indicates a confusion or lack of understanding on Marsh's part about the elements of conspiracy. Marsh did not testify that she expressed any lack of understanding of conspiracy law to Carman prior to rejecting the plea. From Carman's testimony about his discussions with Marsh, the Court discerns no confusion on Marsh's part about conspiracy law. Marsh's claim that she lacked an understanding of conspiracy law at the time of her plea defies belief.

Additionally, "[t]o demonstrate a reasonable probability that [she] would have accepted a plea, [Marsh's] testimony that [she] would have done so must be credible." *Merzbacher*, 706 F.3d at 366–67. It is not. The record is flush with evidence that

35

Marsh's refusal to accept responsibility and admit guilt, not any deficiency of counsel, made her acceptance of the plea offer impossible.

At all times while the plea offer was open Marsh expressed an unwillingness to accept the facts required to enter a guilty plea. As more evidence of her refusal to accept her guilt, even at this late stage, Marsh clings to her assertion of innocence. (*Supra* ¶¶ 26–27; *see also* Mem. Supp. § 2255 Mot. 14–15). While Marsh testified that she only realized she was guilty of conspiracy post-conviction when she conducted her own research in the federal prison, this statement is incredible. Now that she allegedly understands conspiracy law and realizes she is guilty, she has continued to argue that she is innocent and provided testimony in support of this contention. (*See supra* ¶ 26; Mem. Supp. § 2255 Mot. 14–15; *see, e.g.*, Onansanya Aff. ¶¶ 3(f), 3(k), ECF No. 113-1 (explaining that he would have testified that "it clearly would have [been] and is untrue" that "Joan Marsh somehow in any way had participated in the bank fraud scheme"). It is undisputed that Marsh has maintained her innocence throughout her criminal and collateral proceedings. Thus, Marsh's statement that she would have accepted the plea is incredible. *See Merzbacher*, 706 F.3d at 365–67 (holding that even when "there [was] not a shred of evidence that [petitioner's] lawyers counseled him about the plea," he could demonstrate no resulting prejudice because he maintained his innocence throughout the proceedings).

On similar lines, the record also demonstrates that Marsh believed that she had a strong likelihood of being acquitted at trial, independent of and contrary to any advice of counsel. After Carman explained the evidence against her provided by the Government,

36

Marsh "had ideas about why . . . the case might be very difficult to prove against her." (*Supra* ¶ 35.) Marsh indicated that she believed that many of the witnesses would not show up to court because they were her long term friends and that she was confident they would not testify that "[she] knew about this." (*Id.*) Thus, she believed "that the government could not prove the case." (*Id.* ¶ 36.) Marsh also indicated that she was confident that her faith would get her though trial. (*Id.* ¶ 55.) Carman attempted to "discourage[] her from placing too much faith in her religion" but "[Marsh] believed . . . that if she went to trial she would be okay." (*Id.*) Marsh's readily apparent belief that she would be acquitted, despite Carman's caution, also makes Marsh's statement that she would have accepted the plea incredible.

Marsh fails to meet her burden that but for some deficiency of counsel, she would have accepted the plea agreement.[10]  Accordingly, Marsh fails to demonstrate that her refusal to accept the plea was a product of ineffective assistance of counsel.

---

[10] Even if Marsh had made a showing that but for counsel's deficient advice she would have accepted the plea offer, she must also demonstrate that there is a reasonable probability that "the plea would have been entered without the prosecutor's canceling it or the trial court refusing to accept it." *Frye*, 132 S. Ct. at 1409. Marsh wholly fails to demonstrate that the Court would have accepted her plea. First, Marsh's post-conviction argument second-guesses her decision to proceed to trial, on the belief that, if she had pled guilty she would have received a forty-one-month sentence. Marsh's argument centers on a notion that the Court would have found her to be a criminal history category I. Under no circumstances can this Court conceive that a sentence of forty-one months would have been an appropriate sentence for crimes of this nature by a repeat offender. The maximum penalty for a conspiracy to commit bank fraud conviction was thirty years. Marsh was found to be a criminal history category IV. The Court fails to discern how a plea agreement would have had any impact on her criminal history calculation. Thus, there is no "reasonable probability" that the Court would have approved a plea agreement with such a sentence. *See Day*, 969 F.2d at 46.

## V.   CONCLUSION

The § 2255 Motion (ECF No. 104) will be denied.  The action will be dismissed.

An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(B).  A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  Marsh fails to satisfy this standard.  A certificate of appealability will be denied.

An appropriate Order will follow.

                                                        /s/
                                        HENRY E. HUDSON
                                        UNITED STATES DISTRICT JUDGE

Date: Sept 11 2015
Richmond, Virginia